UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

THERMAL DESIGN, INC.,

    Plaintiff,

v.

           Case No.: 07-C-765

AMERICAN SOCIETY OF HEATING,
REFRIGERATING AND AIR-CONDITIONING
ENGINEERS, INC.,

    Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

  Thermal Design seeks a temporary restraining order and preliminary injunction prohibiting the continued publication of literally false statements of fact contained in ASHRAE 90.1-2004 and preempting the publication of the same false statements of fact contained in the soon to be published ASHRAE 90.1-2007. If ASHRAE is not enjoined from publishing and disseminating the false statements at this time, it cannot be corrected until ASHRAE's next scheduled publication in 2010. As explained further below, the false statements not only injure Thermal Design's business but also facilitate fraud on commercial building owners in Wisconsin and across the United States. Moreover, the false statements of fact effectively circumvent Federal and State Energy Codes and result in wasted energy as well as millions of dollars in increased heating and cooling costs to defrauded building owners.

## I. BACKGROUND

  Thermal Design disputes ASHRAE's advertised thermal efficiency values of certain roof insulation systems typically installed in non-residential metal buildings. ASHRAE, on the

surface, is a trade organization that publishes codes including building codes and technical guidance for its members, developed by its members, on how to pass the established codes. (*See* Exhibit A, New Code of Ethics.) Substantively, ASHRAE, a private corporation, has become a pseudo-governmental code-setting entity with the power to dictate United States Energy Code Standards and prescriptive code compliance. Because Federal and State governments have adopted ASHRAE's codes and methods of compliance, ASHRAE's code-setting process and prescriptive methods of compliance have become fertile ground for special interest corruption and manipulation. In the case of energy code compliance of roof and wall insulation for commercial metal buildings, a fox is knowingly allowed to run the hen house.

Under the U.S. Energy Conservation and Production Act, all non-residential metal buildings in the United States that are heated or cooled have to meet a minimum energy conservation standard. (*See* Exhibit B, ASHRAE's U.S. Department of Energy Announcement ("DOE").) ASHRAE's Standard 90.1, *Energy Standard for Buildings Except Low-Rise Residential Buildings*, was established by the DOE as the minimum standard for state building energy codes, including Wisconsin. (*See Id.*) One component of the energy efficiency of a metal building is the overall thermal efficiency of the roof structure, also known as the U-value,[1] and is expressed as the maximum allowable btu's / square foot-hour-F° (temperature difference) of heat transfer through the roof. (*See* Exhibit C, ASHRAE 90.1-2004 Chapter 5, ¶5.5.3.1, and associated tables.) ASHRAE 90.1-2004 sets the minimum standard for the thermal performance of the roofs of metal buildings. For example, a metal building, such as a temperature conditioned athletic field house or indoor tennis court, has to have a roof insulation system, that, when installed, provides for a maximum overall roof heat loss U-value of .065. *Id.* If the

---

[1] Also called "U-Factor" by ASHRAE.

insulated roof system of a metal building does not meet this minimum requirement, it does not pass the state and federal building/energy code. Similar codes apply for wall thermal performance of conditioned metal buildings.

Thermal Design is not disputing the minimum U-value code requirement for roofs and walls of metal buildings published in ASHRAE 90.1-2004. It is, however, disputing the prescriptive code compliance of certain competitive methods of insulating the roofs and walls of metal buildings found in Appendix A of ASHRAE 90.1- 2004. More specifically, the Appendix states that by using a certain grade and method of insulation in typical roof and wall configurations, the systems[2] will achieve the minimum code requirement – this is false. As a designated and accepted standard, Appendix A of ASHRAE 90.1-2004 allows sellers and installers of the described roof and wall insulation systems to get a "free pass" around the energy/building code in Wisconsin and across the United States for systems that do not truly meet the code. In addition to the damage caused to Thermal Design, who sells a system competitive to the one described in Appendix A, Wisconsin metal building owners are being defrauded, inadvertently wasting energy, and paying thousands of dollars more in heating and cooling costs. The cost of properly repairing the affected building roof and wall thermal performances after the defective installation is generally cost prohibitive, resulting in irreparable harm to building owners. (*See* Affidavit of D. Harkins, ¶ 19.)

The typical roof and wall system configurations identified in Appendix A require less materials and take less time to install than systems that truly meet the minimum building code requirement. (*See* Affidavit of D. Harkins, ¶ 20.) Thermal Design is in the business of selling roof and wall insulation systems. (*See* Affidavit of D. Harkins, ¶ 3.) As opposed to the over-the-

---

[2] *See* Exhibit C, Appendix A. ¶A2.3 and ¶A3.2, pp. 81 and 91.

purlin systems described in Appendix A, Thermal Design sells a liner fabric system that truly meets the minimum building energy code requirement for roofs and walls. (*See* Affidavit of D. Harkins, ¶ 18.) Because Thermal Design's system requires more material and requires more time to install, it is more expensive. (*See* Affidavit of D. Harkins, ¶¶ 20 and 22.) On a regular basis, Thermal Design is in competitive bidding situations against sellers of over-the-purlin roof insulation systems. (*See* Affidavit of D. Harkins, ¶¶ 10 and 16.) Thermal Design has lost sales and has had to significantly reduce its prices and profits because of the uneven playing field created by ASHRAE's publication of the false information. (*See* Affidavit of D. Harkins, ¶ 21.)

Thermal Design requests a temporary restraining order and preliminary injunctive relief at this time to mitigate the ongoing irreparable harm caused by ASHRAE's publication of false, deceptive, and misleading information.

## II. LEGAL ANALYSIS

### A. Injunctive Relief is Available.

A party seeking to obtain a preliminary injunction typically must demonstrate that:

1. Its case has some likelihood of success on the merits;
2. No adequate remedy of law exists; and
3. It will suffer irreparable harm if the injunction is not granted.

*TY, Inc. v. The Jones Group, Inc.*, 237 F.3d 891 (7th Cir. 2001).

Once the movant establishes the above elements, the court must consider and balance any irreparable harm that may be suffered by the non-movant if preliminary relief is granted, as well as the effect of the preliminary relief will have on the public. *Foamation, Inc. v. Wedeward Enterprises, Inc.*, 947 F. Supp. 1287, 1294 (E.D. Wis. 1996).

- 4 -

Case 2:07-cv-00765-WEC    Filed 10/10/07    Page 4 of 14    Document 15

B. **Likelihood of Success on the Merits.**

WIS. STAT. § 100.18 prohibits Defendant from making, publishing, disseminating, circulating, or placing before the public an advertisement, announcement, statement, or representation of any kind relating to the purchase, sale, hire, use or lease of real estate, merchandise, securities, service or employment, that contains any assertion, representation or statement of fact which is untrue, deceptive *or* misleading. *See Tim Torres Enterprises, Inc. v. Linscott*, 142 Wis. 2d 56, 65, 416 N.W.2d 670, 673 (Ct. App. 1987) (analogizing statute to Lanham Act and stating that "since the statute lists three separate alternatives, [untrue, deceptive or misleading], the fact-finder only has to determine that a statement is untrue to find a violation of the statute."). "A statement is untrue which does not express things exactly as they are." *Id.* at 65, n. 3 (citations omitted) (defining "untrue" as used in WIS. STAT. § 100.18(1)). The statute permits a person to sue in civil court for fraudulent representation if he or she suffers a pecuniary loss because of a violation of the statute. WIS. STAT. § 100.18(11)(b).

    1. **ASHRAE Publishes Untrue, Deceptive, and Misleading Statements of Fact.**

Based on the attached affidavits and expert reports, ASHRAE is publishing, and will publish in ASHRAE 90.1-2007, untrue, deceptive and misleading representations of fact regarding the thermal performance of over-the-purlin metal building insulation systems. An over-the-purlin system is an insulation system whereby insulation is draped over a steel structure (purlins) and then compressed when metal spanning members (roof panels) are attached to the steel structure. (*See* Exhibit C, ¶A2.3, p. 81.) A similar configuration is applied to walls of metal buildings. (*See* Exhibit C, ¶A3.2, p. 91.)

The systems described in Appendix A of ASHRAE 90.1-2004 do not perform as advertised. The U-value, also called the U-factor, is the measure of the rate of heat loss through

- 5 -

Case 2:07-cv-00765-WEC    Filed 10/10/07    Page 5 of 14    Document 15

a material or system. Appendix A of ASHRAE 90.1-2004 states, "The U-factors, C-factors, F-factors, and heat capacities for typical construction assemblies are included in A2 through A8." (*See* Exhibit C, Appendix A, ¶A1.1, p. 80.) Tables A2.3 and A3.2 contain assembly U-factors for certain insulated metal building roofs and walls (respectively). (*See* Exhibit C, ¶A2.3 and ¶A3.2, pp. 81 and 91.) Tables 5.5-1 through 5.5-8 incorporate the performance data from the Tables in Appendix A. (*See* Exhibit C, Tables 5.5-1-5.5-8, pp. 22-30.) For example, Table A2.3 states that an "Overall U-factor for Entire Base Roof Assembly" of 0.065 can be achieved by installing an over-the-purlin insulation system, wherein the "Rated R-value of [the] Insulation" is R-19. (*See* Exhibit C, ¶¶A2.3.1-A2.2.1, A2.3.3 and Table A2.3 column 4, row 7, p. 81.) The statement of fact that a U-factor of .065 will be achieved through use of R-19 insulation in a typical over-the- purlin roof insulation system is incorporated into Table 5.5-1. (*See* Exhibit C, Table 5.5-1 column 3, row 2.)

The ASHRAE Standard 90.1-2004 and draft 90.1-2007 predicting the performance of typical assemblies for metal building roof insulation state higher thermal resistivities for over-the-purlin standing seam insulation systems than can be achieved with current construction practices. (*See* Affidavit of Leslie Christianson and Affidavit Exhibit A, p.18.) Fiberglass over-the-purlin systems described in Appendix A do not meet the general ASHRAE Standard 90.1 standard equivalent R-Value requirement of 15.4 hr-sqft-F/BTU[3] except for the R-19+19 "sag-and-bag" system, and then only for purlin spacing wider than 30 inches. (*See* Affidavit of Leslie Christianson and Exhibit A, p. 18.) Guarded hot box tests conducted by Oak Ridge National Laboratory verify that fiberglass over-the-purlin R-19 and "sag-and-bag" R-11+19, installed according to conventional construction practices, achieve R-Values approximately 20% lower

---

[3] R-value is the reciprocal of U-value. 1/ R-value (15.4) = U-value (0.065).

- 6 -

than stated in ASHRAE 90.1-2004 and proposed 90.1-2007[4] draft. (*See* Affidavit of Leslie Christianson and Exhibit A, p. 18.) The following chart illustrates the extent to which ASHRAE's published over-the-purlin insulation system U-values fall short of true code compliance.



(*See* Affidavit of Leslie Christianson, Exhibit A, p. 18.)

Looking at the above example, the use of R-19 insulation installed in a typical over-the-purlin insulation system does not achieve a U-factor of 0.065 and consequently does not meet code.

Discussed in more detail below, ASHRAE did not develop the reported U-values but instead adopted advertised U-values of the North American Insulation Manufacturers' Association ("NAIMA"). (*See* Affidavit of D. Harkins, ¶ 7.) NAIMA's advertisement claims that the U-values were developed through an ANSYS Finite Element Analysis ("FEA") software

---

[4] Proposed 90.1-2007 Minimum Code Requirements and Appendix A tables are unchanged

Case 2:07-cv-00765-WEC    Filed 10/10/07    Page 7 of 14    Document 15

program and then verified by comparing the results to available "hot box testing." (*See* Exhibit D, NAIMA brochure, p. 3.) Despite Thermal Design's requests of ASHRAE and NAIMA, neither company could provide the modeling parameters for the FEA. (*See* Affidavit of D. Harkins, ¶ 13.) The FEA, like any computer software program, is only as good as the parameters used to develop the modeling: garbage in= garbage out. Despite Thermal Design's direct inquiry, no one for ASHRAE or NAIMA would admit that the FEA was based on typical construction assemblies. (*See* Affidavit of D. Harkins, ¶ 15.)

2. **Thermal Design has Suffered a Pecuniary Loss.**

a. Direct competition is not required to establish a pecuniary loss.

WIS. STAT. § 100.18 neither expressly requires that restoration of pecuniary losses be made solely by the parties charged with violations of the statute nor does it expressly authorize recovery from a party who has not violated the statute. "The language only requires that any court ordered relief serve to restore any pecuniary loss suffered by a person as the result of the acts and practices involved in the action." *State of Wisconsin v. Excel Management Services, Inc.*, 111 Wis. 2d 479, 486, 331 N.W. 2d 312, 315-16 (1983).

Thermal Design does not compete directly with ASHRAE; however, Thermal Design competes against ASHRAE's members including but not limited to NAIMA, NAIMA's members and NAIMA's customers selling NAIMA members' products. (*See* Affidavit of D. Harkins, ¶¶ 10 and 16.) The FTC defines a liable "corporation" as any company which is organized to carry on business for its own profit or that of its members. *See* 15 U.S.C. § 44. ASHRAE promotes the interests of its members.

---

from 90.1-2004. (*See* Affidavit of D. Harkins, ¶ 5.)

When addressing Wisconsin's Deceptive Trade Practices Act, WIS. STAT. § 100.18, it is important to note that Wisconsin courts have looked to the Lanham Act and FTC decisions to interpret and apply the Act. *See generally Tim Torres Enterprises, Inc. v. Linscott*, 142 Wis. 2d 56, 65, 416 N.W.2d 670, 673 (Ct. App. 1987). The 7th Circuit has held trade organizations accountable for false advertisements that promote profits for members. *FTC v. National Commission on Egg Nutrition*, 517 F.2d 485 (7th Cir. 1975). In *National Commission on Egg Nutrition*, the 7th Circuit Court of Appeals agreed with the District Court that the FTC had jurisdiction over NCEN and the statements in question, stating that:

> [A]lthough NCEN is a non-profit corporation, it was formed to promote 'the general interests of the egg industry,' according to its articles of incorporation and bylaws. Thus, it comes within the scope of section 4 of the Act, 15 U.S.C. § 44, which defines 'corporation' as 'any company . . . which is organized to carry on business for its own profit or that of its members.'

*FTC v. NCEN* at 487-88.

Similarly, courts have applied Wisconsin's Deceptive Trade Practices Act ("DTPA") with a broad brush to prohibit fraud and unfair competition. Looking first to the language of Wisconsin's DTPA, the legislature intended to include trade organizations such as ASHRAE who indirectly promote the goods of its members. WIS. STAT. § 100.18(1) states in relevant part: "no corporation or association...with the intent to sell, distribute, increase the consumption ... directly or indirectly...to the public... shall publish false statements of fact."

When interpreting WIS. STAT. § 100.18, the Wisconsin Supreme Court has held that absent limiting language in the statute, it should be applied to effectuate its goal of prohibiting fraud. *Excel Management Services, Inc.*, 111 Wis. 2d 479. In *Excel Management*, the court addressed whether a company who profited from a violation of the Wisconsin's DTPA was a

proper defendant even though it did not take part in publishing the underlying false information.

The court found that Excel was a proper defendant:

> Although the state's initial purpose in commencing an action under these statutes is to obtain injunctive relief, it is clear from the language of the statutes that the legislature did not intend to limit the circuit court only to granting injunctive relief. Rather, the trial court is given a broad authorization to make the injured parties whole.
>
> As the United States Supreme Court stated in *Porter v. Warner Co.*, 328 U.S. 395, 398 (1946), once the equitable jurisdiction of a court is invoked, "the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."
>
> Because the statutes here involved contain no limitation on the trial court's exercise of its equity jurisdiction, we conclude that the trial court has the full scope of equitable remedies available to it to fashion relief for the parties injured as the result of the acts and practices involved in this action. The question thus becomes whether a court of equity may join as a party defendant a party without whom full relief cannot be granted. We conclude the court may do so.

*Id.* at 490-91.

Accordingly, even if the Court did not find the requisite competition between Plaintiff and Defendant, the Court can equitably enjoin the prohibited false statements of fact. A court of equity may, in fashioning a remedy for the fraudulent conduct of one party, join another party not directly involved in the fraud but one which is necessary to provide complete relief. *Id.* The Wisconsin Supreme Court referenced and relied on the learned thoughts of retired Michigan Supreme Court Justice Eugene F. Black who, in presenting his views on equity jurisprudence, concluded that "[i]f anything justifies equity's existence it is that supreme ability to prevent or remedy fraud in all its nefarious characteristics, no matter how contrived and sought to be effected. Fraud, so to speak, is equity's exclusive dish." *Excel Management* at 491, *quoting* Black, A BRIEF FOR RESURRECTION OF EQUITY JURISPRUDENCE, 60 Mich. B.J. 381, 388 (1981).

### b. Thermal Design competes against NAIMA and its members.

NAIMA promotes over-the-purlin ceiling insulation systems for the purpose of selling "NAIMA 202-96® fiber glass metal building insulation" through its members. (*See* Affidavit of D. Harkins, p. 11 and Exhibit D, NAIMA brochure.) ASHRAE's pass-through reproduction of NAIMA's false advertisement materials provides NAIMA and its members with the appearance of credibility thereby increasing the profits of its members. ASHRAE's actions additionally facilitate the sales of insulation systems in Wisconsin that do not truly pass the energy code.

ASHRAE advertises that it "uses its best efforts to promulgate the Standards and Guidelines for the benefit of the public in light of available information and accepted industry practices." (*See* Exhibit C, Disclaimer, p. 2.) Such diligence was not practiced in relationship to the false information at issue in this case. Instead, the special interests of its committee and sub-committee members were allowed to circumvent the system and create a distinct competitive advantage for competitors of Thermal Design. ASHRAE admits that "[e]very effort is made to balance the concerned interests on all Project Committees." (*See* Exhibit C Disclaimer, p. 2.) ASHRAE refuses to correct the false information and proposes to republish the 90.1-2007 major update of the Standards with full knowledge that the information the NAIMA provided is scientifically unsupported, and in view of overwhelming evidence that the values provided by NAIMA are false. (*See* Affidavit of D. Harkins, ¶ 17.) Thermal Design has been and is denied the right to peer review of the information provided by NAIMA and published by ASHRAE. (*See* Affidavit of D. Harkins, ¶ 12.)

Thermal Design competes against NAIMA and has suffered pecuniary loss as a result of the identified false statements of fact. (*See* Affidavit of D. Harkins, ¶¶ 10 and 21.)

## C. Irreparable Harm will Result from Continued Publication of the False Statements of Energy Code Compliance.

ASHRAE only publishes revised 90.1 every three years and if it is not enjoined at this point, there will not be an opportunity to change this false publication until 2010. (*See* Affidavit of D. Harkins, ¶ 6.) Enjoining ASHRAE from publishing the false information is necessary since there is no adequate remedy of law. ASHRAE Standards including the Appendix A have been adopted by the Department of Energy and the State of Wisconsin. (*See* Exhibit B.) Thermal Design will continue to lose sales as a result of the "free pass" given to its competitors who are able to sell a cheaper non-conforming insulation system. Thermal Design may never be able to fully calculate or determine sales lost as a result of consumers and the State's reliance on the false information.

Courts generally hold that the proof required to obtain either preliminary or permanent injunctive relief under a similar federal deceptive trade practices act, the Lanham Act, is far less than required to obtain money damages. If a plaintiff can show that the challenged statement is literally false, an injunctive decree will generally be issued without any specific evidence of market effect. *See, Coca Cola v. Tropicana Products*, 690 F.2d 312 (2nd Cir. 1982); *American Rockwool Inc. v. Owens Corning Fiberglass*, 640 F. Supp. 1411 (E.D.N.C. 1986). The court in *Tropicana* stated, "when merchandising statement or representation is literally or explicitly false, the court may grant [injunctive] relief without reference to the advertisement's impact on the buying public." 690 F.2d 312, 317 (2nd Cir. 1982). When seeking an injunction under the Lanham Act to prohibit any further repetition of a statement about goods or services that is literally false, the plaintiff need not introduce consumer surveys or other evidence of actual consumer deception. *American Rockwool* at 1411.

In a Lanham Act case dealing with a similar class of goods, insulation products, the court in *American Rockwool* articulated the standard concerning such literally false statements. The court stated that "the plaintiff need not come forward with specific evidence that statements at issue actually resulted in some definite loss of sales. Rather, the plaintiff need only show that it and the defendant are competitors within a certain market and that defendant's alleged statements could logically affect plaintiff's sales market." *Id.* at 1443 (citations omitted).

In the case at hand, the identified false statements logically affect Thermal Design's sales market. Although ASHRAE and Thermal Design do not directly compete, ASHRAE is acting in the capacity and on behalf of its members, and NAIMA and its members, and therefore an element of competition is present.

### D. An Injunction will Benefit the Public.

It is undisputed that the U.S. Energy Conservation and Production Act is designed to conserve energy in the public's best interest. The false statements of fact in Chapter 5 and Appendix A allow inferior roof and wall insulation systems to go unchecked for true thermal performance compliance. Energy is being wasted because the buildings are not insulated adequately. Building owners are paying thousands of dollars more in energy than they would be if their buildings truly met the energy standard. Additionally, once the underperforming system is installed, it is cost prohibitive for most building owners to completely replace the system with a system that truly meets code.

NAIMA and other providers of over-the-purlin insulation systems should no longer be able to rely on the prescriptive compliance guaranteed by ASHRAE 90.1. Rather, these companies should have to demonstrate through accepted scientific means that any system they sell passes code and truly meets the minimum requirements.

- 13 -

Case 2:07-cv-00765-WEC    Filed 10/10/07    Page 13 of 14    Document 15

E.   **ASHRAE Will Not Suffer Any Harm.**

Enjoining ASHRAE from publishing false statements of fact regarding prescriptive compliance with the energy code will not prevent ASHRAE from continuing to publish the remainder of the 90.1 Standard.

### III. CONCLUSION

Thermal Design has demonstrated that its case has some likelihood of success on the merits; that no adequate remedy of law exists; and that it will suffer irreparable harm if the injunction is not granted. Based on the foregoing, Thermal Design respectfully requests that the Court enter a temporary restraining order and preliminary injunction prohibiting the current and future publication of the above identified false information including the false U-factor statements in Appendix A Tables A2.3 and A3.2 and related information contained in Tables 5.5-1 through 5.5-8 in Chapter 5 of ASHRAE 90.1-2004 and soon to be published 90.1-2007.

Dated this 10th day of October, 2007.

s/ Thaddeus Stankowski
Thaddeus Stankowski, SBN 1031421
*Attorneys for Plaintiff*
von BRIESEN & ROPER, s.c.
411 East Wisconsin Avenue, Suite 700
Milwaukee, WI 53202
Telephone: (414) 287-1369
Fax: (414) 276-6281
E-mail: tstankow@vonbriesen.com

20816481_1.DOC